IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| ROY MACK JENKINS III,<br><br>               Plaintiff,<br><br>    v.<br><br>ANDREW SAUL, Commissioner of<br>Social Security,<br><br>               Defendant. | Case No. 19 C 6856<br><br>Judge Harry D. Leinenweber |

## MEMORANDUM OPINION AND ORDER

Plaintiff Roy Mack Jenkins's Request to Remand the Case (Dkt. No. 24) is granted. The findings of the Administrative Law Judge are vacated.

### I. BACKGROUND

#### A. Medical History

Roy Mack Jenkins III ("Jenkins") is 33 years old and currently homeless. (Administrative R. at 45, 219, Dkt. No. 14.) Jenkins first applied for disability benefits under the Social Security Act in July 2016, where he alleges to have suffered a mental disability from birth. (*Id.* at 219.) When asked about his childhood, Jenkins reports being a victim of child abuse until age 12 or 13, including his mother hitting him over the head with a frying pan. (*Id.* at 390, 528.) Jenkins also reports having panic

attacks since he was approximately 10 years old and, when angry as a child, he would "punch and smash things." (*Id.* at 467, 533.)

Jenkins' medical records relating to his mental health begin in April 2011 while he was in state prison as a young adult. Jenkins was incarcerated for stabbing his fiancée's father when the father allegedly "came into [Jenkins'] house wanting to fight [Jenkins]." (*Id.* at 469.) While incarcerated, Jenkins began attending anger management classes, presumably due to his violent criminal conviction. (*Id.* at 433, 437–41.)

Approximately a year after this incident and while Jenkins was still in prison, Jenkins' fiancée decided that, because "her parents were financially supporting her, . . . she could not stay with him." (*Id.* at 469–70.) The prison's mental health evaluation found Jenkins to be depressed and anxious, and he was referred to a psychiatrist. (*Id.*) Following his mental health evaluation, Jenkins was prescribed BuSpar, an anti-anxiety medication, and Celexa, an anti-depressant. (*Id.* at 443, 471.) Follow-up evaluations show that Jenkins was first "stable, coping adequately [and] doing better" and then anxious and depressed again. (*Id.* at 473, 491.) The medical notes reflect Jenkins was considered fairly stable prior to release but was instructed to continue taking Celexa for depression. (*Id.* at 463, 493, 497.) His last mental health evaluation in prison was in October 2011. (*Id.* at 497.)

In June 2012, following his release from state custody, Jenkins entered Loretto Hospital for emergency care. (*Id.* at 362.) The primary impression recorded is depression. (*Id.*) The record indicates Jenkins apparently reported that he had "smoked some bad weed," however, his drug test was negative for all substances. (*Id.* at 365.) Jenkins reported feeling numb all over, shortness of breath, and "appear[ed] very anxious." (*Id.* at 363.) While at the hospital, Jenkins was "acting really bizarre, screaming that his head is bleeding and that the lights are melting and [that] he is getting ready to die." (*Id.* at 364.) According to the record, he eventually calmed down. (*Id.*) Jenkins was released into his father's custody without any prescription for medication and was instructed to follow up with his primary physician. (*Id.*)

As part of his application for disability benefits in 2016, Jenkins was evaluated by psychologist. At that evaluation, Jenkins reported he had mood related symptoms including sadness and was "feeling paranoid that the world was out to get him." (*Id.* at 383.) He denied any history of suicidal thoughts. (*Id.* at 382.) Jenkins also reported he had trouble keeping employment because he has "anxiety and panic attacks and has difficulty being around many people." (*Id.* at 384.) The psychologist diagnosed him with Unspecified Anxiety Disorder." (*Id.*)

In August 2016, Jenkins drove himself to the Franciscan Health Chicago Heights emergency center after a motor vehicle collision.

(*Id.* at 369.) The hospital notes that Jenkins complained of body aches, back, shoulder and neck pain. (*Id.*) When the examining physician determined it was a shoulder strain, Jenkins declined pain medication and was discharged from care. (*Id.* at 372.)

Jenkins' application for disability benefits was denied, and, in 2017, Jenkins requested reconsideration. (*Id.* at 119.) In connection with his request for reconsideration of his disability claim, Jenkins was reevaluated by the Administration. (*Id.*) At that time, Jenkins reported worsening symptoms, including hallucinations and "problems differentiating between dreams and wake reality and talking to people about memories." (*Id.* at 126.) Jenkins also stated that there were changes in functional activities as his coping mechanism were no longer helping him calm down. (*Id.*) Jenkins reported that he "[got] stuck at his mom's house more often because of panic. Being outside is harder." (*Id.*)

In March of 2017, Jenkins went to his primary care physician with an unrelated concern about a skin condition. (*Id.* at 400.) In his social history screening, Jenkins reported that he had difficulty concentrating, remembering or making decisions, doing errands alone, driving out night, reading, and watching TV. (*Id* at 401.) Jenkins attributed his difficulties to his anxiety. (*Id.*) He reported drinking "four to five drinks a day and 8 shots per day of liquor for the past two months because of progressive anxiety." (*Id.* at 403.) He reported dizziness, chronic pain, and chronic

fatigue. (*Id.* at 402.) In the physician's review of Jenkins psychiatric symptoms, he noted "depression, sleep disturbances, restless sleep, and alcohol abuse." (*Id.* at 404.) He was prescribed two different types of anxiety medications, Busprione and Clonazepam. (*Id.* at 406.)

In October 2017, Jenkins entered an emergency room at the University of Chicago hospital bleeding from his chest. (*Id.* at 526–27.) According to the hospital records, Jenkins "mistakenly cut his chest with a razor blade [because] [h]e was fixing on a door and panicked." (*Id.* at 527.) During that hospital visit, Jenkins reported "intermittent thoughts about harming himself." (*Id.*) Jenkins also reported "feeling increasingly depressed" since two of his friends had committed suicide and two others had died of drug and alcohol overdoses. (*Id.* at 528.) Jenkins reported trouble sleeping, trouble eating, depression, anxiety, panic attacks, and active auditory hallucinations. (*Id.* at 528.) The University of Chicago physicians diagnosed Jenkins with anxiety and depression and recommended he follow up with counseling and a medication evaluation. (*Id.* at 536.)

### B. Procedural History

Jenkins filed his application for social security benefits in July 2016. This application was denied in November 2016. The Social Security Administration provided the following explanation: "The medical evidence in your file shows your condition does cause some

restrictions in your ability to function. However, you still have the ability to do unskilled, heavy work." (*Id.* at 138.)

Jenkins requested a reconsideration of this decision. (*Id.* at 142.) In its reconsideration, the Social Security Administration considered a claim under both 20 C.F.R. § 404, Subpart P, App'x 1, 12.04 (Depressive, Bipolar and Related Disorders) and 12.06 (Anxiety and Obsessive-Compulsive Disorder) and determined Jenkins had severe anxiety. (*Id.* at 125.) Nevertheless, the Administration determined Jenkins was capable of performing unskilled manual labor and denied his reconsideration request in July 2017. (*Id.* at 142-45.)

In September 2017, Jenkins requested a hearing before an Administrative Law Judge ("ALJ"). (*Id.* at 146.) His hearing was scheduled for May 1, 2018, but Jenkins failed to appear. (*Id.* at 163.) Jenkins subsequently wrote to the ALJ that he did not come to the hearing because "I am afraid of normal people. [T]hey drive drunk and I am afraid. I am poor, I am homeless. [The hearing was scheduled] far from my house." (*Id.* at 185.) Jenkins' hearing was rescheduled for September 10, 2018. (*Id.* at 211.)

The hearing was held before Administrative Law Judge Matthew Johnson on September 10, 2018, in Orland Park, Illinois. (*Id.* at 74.) At this hearing, Jenkins arrived with the assistance of his former romantic partner, Ms. Herrera. (*Id.* at 75.) Jenkins reported that he was homeless and that he had been receiving food

stamps, but they had been cut off pending his social security benefits review. (*Id.* at 88.) Jenkins reported that he attempted to attend college and vocational training, but he "keep[s] failing." (*Id.* at 89.) In his application for Social Security, Jenkins listed four jobs, all of which he was unable to maintain employment for more than three months: (1) bagger at a grocery store ($6.00/hour); (2) corn breeder ($9.00/hour); (3) movie marketer ($9.00/hour); and (4) mechanic at a bicycle and ski repair shop ($7.00/hour). (*Id* at 227–28, 250.) Jenkins' certified earnings records indicates he has never made more than $2,736 dollars in a single year and has not held a job since 2010. (*Id.* at 244.) The ALJ considered this record to be devoid of "past relevant work." (*Id.* at 89.)

When the ALJ asked why Jenkins was unable to work, Jenkins explained that people made him "very uncomfortable." (*Id.* at 89.) He also apologized for yelling at the security guard before the hearing, and explained it was "very difficult for me to listen to people who don't understand how I feel inside. It makes me very, very, very [inaudible], and I just don't want to hurt anybody again. I don't want to go back to prison. I really don't. I want to watch my [daughter] grow up." (*Id.*)

Jenkins explained that he avoids further violence by avoiding other people. (*Id.* at 90.) Jenkins summarized his interactions with other people as follows: he visits the mother of his daughter,

- 7 -

Ms. Herrera, twice a week, and he stands in line with a numbered ticket once a week to receive free food. (*Id.* at 91.) Jenkins reported that he no longer took his prescribed medication, no longer drinks or smokes marijuana, no longer uses fluoride toothpaste, soda, or "anything made in a lab." (*Id.* at 92.) Jenkins reported that his anxiety physically manifests by having a tight chest and a tingling sensation. (*Id.* at 93.) Jenkins reported skateboarding, going to parks and climbing trees, and charging his phone at the Harold Washington Library. (*Id.* at 94-95.) Jenkins also reported confusion and varying emotional states, which included: feeling that he is scared to die, feeling that there's no reason to try to live and wanting to commit suicide, and feeling strongly that he wants to take care of his children. (*Id.* at 95-96.)

Ms. Herrera, the mother of Jenkins' youngest daughter, was sworn in as a witness. (*Id.* at 75.) The ALJ then asked Jenkins to step out of the room so that he could question Ms. Herrera privately. (*Id.* at 97.) Ms. Herrera's opinion was that Jenkins was "unable to work – clearly he's mentally ill." (*Id.*) Ms. Herrera stated that Jenkins "has good days and good days are good, but most of his days are bad." (*Id.*) Ms. Herrera stated that "the second someone tells him something he doesn't want to hear he gets riled up to say the least. He can get violent really quickly." Ms. Herrera stated that his condition was "50% anxiety, 40% rage, anger

issues, and 10% depression where he'll just not be able to function and be suicidal." (*Id.* at 97–98.) Ms. Herrera noted that Jenkins "was not really much of a threat to himself as he's really afraid of getting hurt most of the time, but he is a threat to other people." (*Id.* at 98.) Ms. Herrera noted that Jenkins broke her jaw as recently as two months ago, but that she continued to assist him because she is "a very understanding person." (*Id.*)

Before Jenkins reentered the room ALJ stated that he had "no reason to doubt [Ms. Herrera's] veracity," but expressed concern that there was "nothing in [the record] to show he's having any problems." (*Id.* at 98.) Ms. Herrera listed the hospital incidents described above, but she also indicated that Jenkins refused to go to doctors when he was ill and "doesn't believe in Western medicine really." (*Id.*) The ALJ next suggested Jenkins should have sought an "Eastern healer" for his ailments, Ms. Herrera concluded her testimony stating that Jenkins was "definitely afraid of society to the point he will fight it violently." (*Id.* at 98–100.)

The ALJ then called a vocational expert, Ms. Bethel, to testify. (*Id.* at 102.) Ms. Bethel did not review Jenkins file, but she did answer various hypothetical questions about whether a person of Jenkins age and educational status could participate in the workforce with various limitations on his interaction with other people, ability to miss work, and whether or not he could finish his assignments (*Id.* at 103–04.) The ALJ noted that he did

not bother asking Ms. Bethel whether or not a person could have a job in the national economy without any interaction with a supervisor or co-worker because "obviously [if] you never can talk to your supervisor or co-worker then there's no work." (*Id.* at 104.)

On July 3, 2019, the Administrative Law Judge denied Jenkins' application. (*Id.* at 57.) On September 5, 2019, the Appeals Council denied Jenkins' request for a review. Jenkins appealed the decision in federal court and now moves to reverse or remand the findings of the Administrative Law Judge in his case. (Mot. to Reverse, Dkt. No. 24.)

## II.  **LEGAL STANDARD**

The Court reviews the Commissioner's final decision pursuant to 42 U.S.C. 405(g), which provides that the Commissioner's findings of fact are conclusive "if supported by substantial evidence." The Court reviews the existing administrative record and asks, "whether it contains sufficient evidence to support the agency's factual determinations." *Biestek v. Berryhill*, 139 S.Ct. 1148, 1154 (2019) (internal quotations omitted). The threshold for evidentiary sufficiency is not high; it means "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Id.* The reviewing court is not "to reweigh evidence, resolve conflicts, decide questions of credibility, or substitute its judgment for that of the Commissioner." *Burmester v. Berryhill*,

920 F.3d 507, 510 (7th Cir. 2019) (citing *Lopez ex rel. Lopez v. Barnhart*, 336 F.3d 535, 539 (7th Cir. 2003)). If substantial evidence supports the disability determination, the reviewing court must affirm even if "reasonable minds could differ" concerning whether the petitioner is disabled. *Id.*

### III. <u>DISCUSSION</u>

The Administrative Law Judge follows a five-step evaluation process to determine whether a person is disabled and thus eligible for social security benefits under the Social Security Act. 20 C.F.R. 416.920(a). Each step acts as a gatekeeper, determining first if the claim merits further analysis, and, if it does, the scope considered in the subsequent steps. The first step analyzes whether or not the claimant is employed in substantial gainful activity. *Id.* at 416.920(a)(4)(i). If the claimant is not, the ALJ continues the evaluation process. *Id.* At the second step, the ALJ determines whether the duration of the impairment either has lasted or is expected to last "for a continuous period of at least 12 months" or "is expected to result in death." 20 C.F.R. 416.909; 416.290(a)(4)(ii). If the duration requirement is met, the ALJ moves to step three and considers whether the severity of the impairment or impairments meets the requirements as listed in the Act's appendix of medical conditions. *Id.* at 416.920(a)(4)(iii). If the claimant has a medical condition that meets the severity

and duration requirements, the claimant is considered disabled. *Id.*

On the fourth step, the ALJ considers their assessment of the claimant's residual functional capacity and whether the claimant can perform past relevant work. *Id.* at 416.920(a)(4)(iv). On the fifth step, the burden of proof is on the agency, and "the agency must show that even though the claimant could no longer perform his past relevant work, he was capable of performing some other work in the national economy." *Kaminski v. Berryhill*, 894 F.3d 870, 876 (7th Cir. 2018), amended on reh'g (Aug. 30, 2018).

The parties agree that, per step one, Jenkins has performed no substantial gainful activity that would disqualify him from the subsequent analytical steps. Jenkins argues, however, that ALJ failed to use the "special technique" required to assess mental health disabilities. When reviewing for mental impairments that potentially qualify as a disability, the ALJ "must follow a special technique at each level in the administrative review process." 20 C.F.R. 404.1520a(a). Using the special technique, the ALJ "must first evaluate [the claimant's] pertinent symptoms, signs and laboratory findings" to determine if the claimant has an impairment. *Id.* at 404.1520a(b)(1). The ALJ then rates the claimant's functional limitation in four areas based on a five-point scale: (1) understanding, remembering, or applying information; (2) interacting with others; (3) concentrating,

persisting, or maintaining pace; and (4) adapting or managing oneself. *Id.* at 404.1520a(2)-(4).

In steps two of the ALJ's decision about Jenkins, the ALJ carefully reviewed the medical evidence regarding Jenkins car crash and subsequent injuries and determined that the injuries were non-severe. (Administrative R. at 59–60.)

The ALJ's determinations of Jenkins' mental impairment in steps two and three, however, do not show that the ALJ employed the 'special technique' as required under 20 C.F.R. § 404.1520a. Instead, the ALJ made a one-sentence determination that Jenkins's only severe mental impairment was anxiety. (*Id.* at 59.) While the Court's review of the same material found that the record certainly could support an impairment of anxiety, it could also potentially support a diagnosis of depression, impulse-control disorder, a psychotic disorder, or others, as set forth in 20 C.F.R. § 404, Subpart P, App'x 1, 12.03, 12.04, and 12.08, respectively.

The regulation unambiguously requires the ALJ to review the medical evidence in order to determine the claimant's mental health impairment. The ALJ's failure to employ the special technique is reversable error that merits remand. *Craft v. Astrue*, 539 F.3d 668, 675 (7th Cir. 2008) (Even when "the ALJ did determine that Craft had a severe mental impairment and considered whether it met or equaled a listed impairment," failure to employ the special technique ultimately "gave short shrift to potential limitations

- 13 -

caused by Craft's mental impairments, and that error requires a remand."); *see also Richards v. Astrue*, No. 09-2595, 2010 WL 1443893, at *3 (7th Cir. April 13, 2010) (reversal for failing to apply the special technique).

Jenkins further argues that the ALJ failed to use the special technique properly when rating the degree of functional limitation resulting from the impairment as set forth in 20 C.F.R. § 404.1520a(b)(2). Specifically, Jenkins argues that the ALJ did not consider the episodic nature of his impairment, citing *Lane v. Astrue*, where the district court remanded based on this same failure. No. 09 C 3277, 2012 WL 1623204, at *15 (N.D. Ill. May 8, 2012). The Commissioner argues that, because new regulations took effect in January 2017, the ALJ is no longer required to consider 'episodes of decompensation' when making its determination. The Commissioner also referred to the revision's instructions, which make it explicit that the new regulations would apply to all pending claims. 81 Fed. Reg. 66138, n.1 (to be codified at 20 C.F.R. pt. 404).

The Court agrees that the revisions apply, and in any case the application of the new revisions was not challenged by Jenkins. However, under the new regulations, the ALJ is still mandated to consider Jenkins' limitations as they vary over time. As set forth in the current Code of Federal Regulations:

> We will rate the degree of your functional limitation based on the extent to which your impairment(s) interferes with your ability to function independently, appropriately, effectively, and on a sustained basis. Thus, we will consider such factors as the quality and level of your overall functional performance, any episodic limitations, the amount of supervision or assistance you require, and the settings in which you are able to function.

20 C.F.R. § 404.1520a(c)(2). Instead of considering the episodic nature of Jenkins mental impairment or impairments as a separate category, the ALJ is required to consider the episodic nature of Jenkins functional abilities in each of the four broad areas outlined in 20 C.F.R. § 404.1520a(c)(3).

Upon reviewing the record, it appears that the Administrative Law Judge failed to consider the variability in Jenkins' mental state in any of the listed categories. For example, when considering whether Jenkins could interact with others, the ALJ determined Jenkins self-reported ability to climb trees in parks and stand in line at food banks as evidence of prosocial behavior. (Administrative R. at 61.) However, the ALJ did not review the more particular and specific episodes of Jenkins antisocial behavior. (*Id.*) In Jenkins case, evidence of anti-social behavior includes but is not limited to Jenkins recently breaking Ms. Herrera's jaw, the only person Jenkins lists as having an ongoing relationship with during the course of the hearing, as well as shouting at a security guard who didn't let Jenkins bring his own

- 15 -

water bottle into the building on the day of the hearing. (*Id.* at 89, 98.)

The ALJ also failed to consider how Jenkins paranoid beliefs periodically prevent him from engaging in in social behavior at all, including being unable to come to the first scheduled hearing due to a concern that "normal people" were drunk driving, and his refusal to go to the doctor when he suffers from mental and physical ailments. (*See, e.g., id.* at 99-100, 185.) Finally, the ALJ did not consider whether Jenkins intermittent hallucinations would interfere with his ability to get along with others. (*See, e.g., id.* at 364, 528.) Although the Court agrees that the ALJ was permitted to reorganize how he analyzed the information per the newest regulations, the essential nature of mental health did not change in 2017, nor did the regulations change the requirement of the ALJ to consider the episodic nature of mental health as set forth in 20 C.F.R. § 404.1520a(c)(2). While the district court is not permitted to "reweigh the evidence, resolve conflicts, decide questions of credibility, or substitute its own judgment for that of the Commissioner," failure to consider the evidence in favor of the plaintiffs' claim is grounds for reversal. *Godbey v. Apfel*, 238 F.3d 803, 807 (7th Cir. 2000) (quoting *Clifford v. Apfel*, 227 F.3d 863, 869 (7th Cir.2000)). For this additional reason, the Court "cannot discern the logical bridge from the evidence to the

ALJ's conclusions" and vacates ALJ evaluations of Jenkins' functional limitations. *Lane*, 2012 WL 1623204, at *15.

### IV. CONCLUSION

For the reasons stated herein, the Court grants Plaintiff Jenkins' Motion to Remand, (Dkt. No. 24) vacates the ALJ's findings, and orders the case remanded for further proceedings consistent with this opinion. The Court declines Jenkins' request to find he is entitled to disability benefits as a matter of law.

**IT IS SO ORDERED.**

                                            Harry D. Leinenweber, Judge
                                            United States District Court

Dated: 2/26/2021